at all. Arguments not to exceed 15 minutes in silence. Mr. Wray will be appelled. Good morning, your honors. I would like to ask for two minutes for rebuttal. Certainly. Starr Dixon urges this court to find that the district court's interpretation of the Equal Credit Opportunity Act and the regulations there under was unduly restrictive when the court ruled that an affirmative defense could not be raised as a matter of law as a result of a violation of the Equal Credit Opportunity Act on a suit on the guarantee that was obtained on that basis. We also urge the court to grant summary judgment in this matter as the facts or the material facts are not in genuine dispute. If I might briefly discuss those facts from John Bryan's affidavit, who was the loan officer at BB&T who made the loan. In the spring of 2008, BB&T was approached for two loans by Mr. Dixon from behalf of his real estate developments. The first one was Bridgemill, which was a $6.4 million loan. The other one was the Mabry Farms, which was a $3.2 million loan. After discussing these loans, the decision was that he needed more collateral. So they came up with $2.4 million of BB&T stock that was owned by Mr. and Mrs. Dixon, and that was pledged. Well, first there was something about the daughters having to collateralize the loan and provide a guarantee, putting up their assets. And then the husband and the wife here decided they didn't want the daughters to do it, so the wife put up her guarantee and her assets. Is that the way it happened? Well, as I read his affidavit, he's saying that they first were studying that. They then got the additional collateral, which was another $662,000 of Pioneer stock. When they evaluated the appraisals, they then decided that they needed additional items, and that was when they got asked for the guarantees. According to Mr. Bryan, they asked for the guarantees, as Your Honor pointed out, for the daughters who have wealth of their own. And then when Mr. Dixon said, no, I'm not going to grant them, then supposedly it was offered up Mrs. Dixon's. When you say they asked for the guarantees, who? I mean Mr. Bryan. Mr. Bryan was the loan officer and the BB&T. Yes, yes ma'am. Counsel, here's what I don't quite understand there is. The act that you're talking about proscribes discrimination. It's a discrimination statute. It proscribes discrimination against the spouse, who presumably is normally a female, but it doesn't forbid her or say that if her husband or the business they're in or whatever can't get the loan, that she is somehow forbidden from guaranteeing the loan. The regulations actually do. If the loan is creditworthy under 202.7D1, that's of the CFRs, if the loan is creditworthy, otherwise under the bank standards, and this loan was because they only made the Bridge Mill loan. They only made a $6.4 million loan. According to Mr. Bryan's affidavit, they had the Bridge Mill property worth appraised for $5.65 million. They had the $2.4 million of BB&T stock, and they had the $662,000 of Pioneer Bank or Pioneer DeVenture. That totals over $8.7 million. He further testified in his affidavit they had a loan to value of 75%. My math shows that that's over $6.5 million for a $6.4 million loan. Who's to say exactly who says what is creditworthy and what isn't? Well, the bank's creditworthy standards that they have established, that's what the regulations deal with. That's what Mr. Bryan testified. That's what the May 2, 2008 letter setting out what the requirements were for that loan was a 75% loan to value. And as a result... All the banking I know about, it's a judgment that someone's got to make about what is or is not creditworthy, and that depends on the profitability of the underlying assets and whether they are how likely or how risky is the problem of the bank getting paid. And that would vary tremendously with the nature of the assets that are underlying the... that are providing the security for the loan. Well, I can't just say in all cases 65% or 75% or whatever is a figure that is creditworthy. Some banker's got to make a judgment about that. But each bank has established standards for creditworthiness. I represent banks, too. I sort of go both sides. And banks will take anything and everything they can. These regulations are designed to prevent them from taking and requiring a wife's guarantee solely because she's married to the owner of the business. That's what they're aimed at. And that regulation that I mentioned says that if the loan is otherwise creditworthy, then the bank, it is unauthorized for them to request a guarantee... To determine creditworthiness in the court? No, Your Honor. The bank has their own standards. And this loan, the bank's standards, according to Mr. Bryan's affidavit in this case, says that a 75% loan to value is what they were making a loan on. The collateral needed to total 75... Where is this document that says this? Where is the... What is the evidence of that? Well, his affidavit, number one. And number two is... Whose affidavit are you talking about? John Bryan, the loan officer that made the loan. Second... And in this case... Yes, Your Honor. 75% was the loan to value. Can you give us the page in the record of... Paragraph 18 of the affidavit, Your Honor. And I would call the court's attention. It's interesting because all of his statements about the creditworthiness of this loan had to do with the two loans. The decision was made after they get her guarantee or agreement to do the guarantee. They're only going to make the bridge mill loan. It changed. They never revisited the issue of creditworthiness. The regulations say that they can't take a guarantee, if the loan is otherwise creditworthy, from the spouse or other person. The reason that it says that is because they can't do indirectly.  They can't do it indirectly. If it's not creditworthy, the regulation, and that's not the case here, the regulations say they can't require the spouse. They can ask for somebody else. That's what that goes to, the issue of asking the daughters to sign. But here, and the protected class, you know, if they ask the daughters to sign, they've got $10 million of collateral. That's okay because she's... Assuming that you win on the question of affirmative defense. Yes, Your Honor. Like in that Iowa case, what's the name of that case? Yes, sir. You're familiar with that anyway. Yes. Your position would be established under the doctrine of that case. But then you would have to have a factual assessment of what is creditworthiness in this case. I mean... I don't think so, Your Honor. They've already said what is creditworthy in his affidavit. You've taken us to paragraph 18 of the affidavit. What exactly in paragraph 18 shows that the guarantee of the wife was demanded? Well, again, in 18, I was addressing the issue of 75% of loan... Right. So I don't understand what part of the affidavit then supports your position that we could grant summary judgment to you. Well, they still... The regulations prevent the taking of a guarantee if the loan is otherwise creditworthy. Now, you can't always have a discrimination action, of course, because a son, a daughter, a mother, a father, those are not within the protected class. Regulation 202.7d.1 says that it's an unauthorized activity to require a guarantee by the spouse or other person. That's a different thing to require a guarantee than to accept a guarantee. Oh, now he says it here that they required a guarantee. Where is that statement? In paragraph 15, he says, I told him that he, Bridge Mill, and or a third party would have to pledge additional collateral to secure the new loan. That's not... They did. The wife has to do it. Correct. Then he goes on the next paragraph is where he says, well, they could assume the debt and talks about it, and then that's when they asked for and demanded an additional guarantee. Here's the language that they demanded a guarantee from Star. You just got through telling us that you had a document that said that. Yes, Your Honor. All we want is for you to read the language of the document that says that to back up the statement you've just made to the court. This is from the record number 389, May 2, 2008, letter, requirement summary, BB&T loan requirements. Number one, Mrs. Dixon will be required to co-sign the notes with her future release subject to negotiation. The bottom of that says, loan amount must not exceed 75% of the collateral value after appraisals. This was done when they were going to make both loans. When they decided not to do both loans, it suddenly changed dramatically their loan to value on the collateral. They still kept the $2.4 million of BB&T stock. They still kept the Pioneer, and they still kept Mrs. Dixon's guarantee that they no longer required because the loan was then creditworthy. That's why I say that before the court today, there's no dispute of facts. Those are all within Mr. Bryan's definition. The original deal, as I understand your submission, the original deal also violated the credit act? I don't think so. I think that they'd done the Mabry loan, too, because the problem with Mabry, it was not appraised enough. They didn't have enough appraised value for the real estate, and that's in paragraph 18 of Mr. Bryan's affidavit. What's the deal with paragraph 20 of his affidavit? Where he says, at no time did I express that she was required to be a guarantor on this loan. Well, paragraph 16, what he's referencing here is, I didn't require Mrs. Dixon, but I did require another guarantor. And that has been one of my questions throughout. It surely should be okay for a lending agency to require a guarantee from somebody if there isn't enough in the way of assets. But the question is, how is the bank requiring Star's guarantee here in violation of the Equal Credit Opportunity Act? When they made the loan, they had enough collateral for Bridge Mill. You're saying it wasn't necessary for them to get a guarantee. And that's what the statute and the regulations are geared to go against. So they can't accept the wife's guarantee if she chooses to give a guarantee? In practical banking, no one is offering guarantees. Nobody chooses to come in and say, I really would like to guarantee this loan. My problem with your argument that you're entitled to summary judgment is that it would seem that paragraph 20 establishes a fact question. Well, only if you're finding a fact dispute within his own affidavit. But when you are asking for summary judgment in your favor, we take all of the facts in the light most favorable to your opponent, Mr. Bryan and his bank, or whoever the other side is. Again, I don't read that because he says, I didn't speak to her. But in paragraph 16, he makes it clear he was requiring in this letter that I just read the requirements for it. That's what number 20 is actually addressing is this provision of this document when he says, Mrs. Dixon will be required to co-sign the notes with her future release. You've mentioned, maybe it's a slip, but you've mentioned 16. 16 says, Mr. Dixon chose Mrs. Dixon over his daughter. And at no time in this meeting did I tell Mr. Dixon or anyone that Star Dixon would have to serve as the guarantor. But he's addressing the other prohibited transaction in the ECOA or the regs, which is, if it's not credit worthy, which is not the case here, you can't require the spouse. What bankers do, they say, well, we need another guarantor. Can you come up with somebody? Well, all I've got is my wife. Well, that's okay. That's okay if it's offered up. That's in a different reg. That's entirely different. We have a credit worthy loan. The reason that if the father guarantees it or a son or the daughters guarantee it, that that's not a violation of the ECOA is because they're not within the protected class. The protected class is marital status. Thank you. Your Honor, Sam Ziegler here on behalf of the Apolee RLBB Acquisition LLC. We started off by jumping to the facts, so I'll briefly address those, Your Honors. To Judge Merritt's point, it's not true that all spousal guarantees are ipso facto invalid under the Act or Regulation B. In fact, a bank, any kind of lender, can accept a spousal guarantee provided that certain requirements or standards are met. And what we've talked about here, what Mr. Ray has talked about, is this notion that the borrowing entity, Bridge Mill Commons, and Hal Dixon, which is the husband guarantor, were independently credit worthy. Therefore, BB&T, the original lender, cannot accept, cannot take, cannot require the wife's guarantee, Stardix and the appellant. Well, that's nowhere in the record. It's a misstatement of Mr. Bryan's affidavit. And again, John Bryan was the originating loan officer for BB&T. Mr. Bryan unequivocally says, paragraph 14 of his affidavit, which is page 378 of the record, that he concluded for the bank that Bridge Mill and Hal Dixon were not independently credit worthy. And to Mr. Ray's argument about this loan-to-value ratio, the amount of collateral that's being put up for the loan, this 75% figure, well, that was a minimum but not necessarily sufficient condition of making a loan. That was one part of the credit analysis. And again, as Mr. Bryan's affidavit states, and that was uncontested testimony, I would add, Your Honors, there was no deposition of Mr. Bryan. For whatever reason, Stardix and chose not to depose him. So that stands uncontested below that, in fact, under BB&T's standards of credit worthiness, Hal Dixon was not independently credit worthy. So this whole notion that the court here, at this posture of the case, can grant summary judgment for Stardix, there's no merit to it at this point. So at the very most the court could do at this level is, if it found that there is, in fact, an affirmative defense under the ECOA and Regulation B to a spousal guarantee, it would have to remand for fact findings by the fact finder, the trial court. So we should get to the legal issue in the case? We should, Your Honor. We should. And I will touch on that. And I won't regurgitate the briefs, but here's what I want to highlight. The district court made the reasoned conclusion that looking at the plain terms of the statute, there is no room, there is no language, there is nothing that indicates or suggests that a spousal guarantor can void their entire guarantee liability if there is a violation. Again, we're assuming a violation. Is there anything that prohibits this being used as an affirmative defense? There is no prohibition. So there is no language. Why wouldn't it be within the purpose of the statute to allow an affirmative defense akin to recoupment? Because it does not effectuate the purposes of the statute. The statute, and I'll quote here from this court's opinion, Midkiff v. Adams County Regional Water District, the ECOA's purpose is to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refuse to consider for individual credit. To Judge Merritt's observation earlier, it's hard to see what discrimination mystics and the appellants suffered here. But even assuming that she... How are you going to set up a system that will honor that purpose if the bank can, after there's a default, some years later or we don't know how long later after the guarantee is given, can sue everybody for defaulting, including the spouse guarantor, and the spouse guarantor cannot then say that this deal was void because it was purposely discriminatory under the act? How could you administer the act if that were allowed? That is, you could, five years later, the spouse could not set up a defense based upon the violation of the act. Here's my answer to that, Your Honor. First off, that's limited to the scenario that we have before the court today, which is a spousal guarantee. The act obviously covers more evils than just the spousal guarantees. The classical case is a married woman who goes to apply for a loan and the lender says, we need your husband to apply too, or else we're not going to give you the loan. There you're not going to have a lawsuit down the road. You're going to have the wife, the aggrieved applicant under the statute, filing a lawsuit of her own. That's why there's affirmative claims underneath the statute. So we're talking about a smaller universe of potential ECOA violations. I thought this was designed primarily, this act, to protect the spouse who was assumed in most cases to be a female, and it is designed to avoid discrimination against the female spouse, and that's what is being claimed in this case. What I'm saying is how could you administer the act if five years afterward or some period of time there's a default and the spouse, female spouse, is sued but now cannot erect as an affirmative defense the violation of the act? She cannot, Your Honor, because, again, it's not in the statute and it's not in the regs. There is an extended statute. What I'm just saying is a common sense matter. How are you going to carry out the purposes of the act in that situation if the female spouse is no longer able in our legal procedure to set up the violation of the act as a defense? You can't at that point, Your Honor. It's just too bad the act doesn't call for it, so you can't do it. That's correct, Your Honor. If it's outside of the statute of limitations, she cannot bring the claim, and there is no defense. What's the case law? How does the case law split on this? Is this an Iowa case? What is it, the First Circuit? And Third Circuit. Say the same thing as Iowa? Exactly, Your Honor. The theory there is, well, it's essentially in the nature of recoupment. It's a set-off type claim so that that's not barred by the statute of limitations under any circumstances, so the spouse can come back and essentially set off or wipe out the guarantee liability under that theory. What's wrong with that theory? What's wrong with that theory is it's not, well, there's a fundamental problem in this case with it because my client is a successor institution to the original lender. And actually, I believe it was the Third Circuit pointed this potential problem with the recoupment theory as using that as a vehicle in these cases. Recoupment assumes an identity of parties from the original transaction. Original borrower, original lender. Original lender comes back and sues original borrower. Borrower then has a recoupment. Didn't this bank here take an assignment? It did. It assigned. Value and shouldn't we presume this is a regular capitalistic contract that got this in the hands? I mean, what are we going to do, repeal a system that banks can buy loans? No, absolutely not, Your Honor. And there's limits to that sort of counter-argument in any event because then a bank could just simply assign it to a wholly owned entity. You assume away that you're a successor and that that's a problem. What's wrong with the courts that have reached the opposite result than what you're arguing? Because it's not envisioned in the statute. So basically you're saying that the purpose of the statute was to protect married women who are trying to get their own loans. Correct. And that the statute doesn't apply to married women who are hypothetically forced to give guarantees in order for their husbands to get a loan. Yes, that's right, Your Honor. And where do you go to say that is the purpose of the statute? The Congressional findings and statement of purpose in the original Act of 1974. And that's Public Law 93-495, Title V, Section 502. In the last sentence, which is the operative purpose statement, it is the purpose of the Act to require that financial institutions  make that credit equally available to all credit-worthy customers without regard to sex or marital status. Well, that can mean most anything. It is. It is a broad purpose, absolutely. But here again, Your Honors... So normally, as you pointed out, it's a 1974 Act. Normally we would look at all the cases that had been decided since that time and see how the cases have applied that language that you've mentioned, and whether there's other language. I'm not saying that you're hiding any language at all. And we have three cases that seem to go the opposite way. Is there a case that goes your way? Yes, there's a number of district court opinions that are cited in the brief from circuits outside of the First and Third Circuit. There's the Riggs decision from the Eastern District of Virginia. There's the Best Vinyl decision. The Riggs decision was about 20 years ago. A lot of these are from the 90s for whatever reason. But there's more recent authority. The Best Vinyl decision from the District of Utah in 2013. The Western District of Missouri. So we need and obviously are looking at those cases for their persuasive value. So hypothetically, let's make the argument that you need to respond to, which is that the Equal Credit Opportunity Act should have a broad prophylactic purpose. And why is this hypothetical broad prophylactic purpose not appropriate here in the case of a guarantee? Because while there is a broad prophylactic purpose, it's a remedial statute, the sky is not the limit. And here's why I say that. The remedies are explicit in the statute in 1691E. And I'm not going to walk through every one of those. Well, I guess I will. Actual damages, punitive damages, costs and attorney's fees. And then this is really the hook where most of these courts are finding an affirmative defense. Equitable and declaratory relief. And that, of course, manifests the remedial nature of the statute. But it's not just any equitable and declaratory relief. And I'm quoting now from the statute. And the regs simply restate the statute. It's equitable and declaratory relief, quote, as is necessary to enforce the requirements imposed under the act, end quote. Now, I suppose that might beg the question, well, what is necessary? And our position is, and the opinion of the district court below is, it's not necessary to vitiate a $3 million worth of liability on this guarantee because that's what happens if, in fact, the appellant's argument wins the day and she can actually win on the facts. So then the... Unfortunately, it looks like you have to get to the facts. Let me tell you that most federal judges would be pleased not to have to get into factual disputes over whether a bank should have called on guarantees. I mean, you know, we don't know anything about that. I have no expertise in it and don't want to be in it. But we do have to carry out the statute and the implications that are clear as the First Circuit and the Third Circuit describe. That's the problem. You know, this is not something we're jumping up and down to do to get into when the bank should call on more security. You understand? I understand that, Your Honor. But I don't see how this statute can be implemented unless this woman can at least claim that in an affirmative defense that she was discriminated against under the statute. It doesn't seem like to me she's going to be able to show that just right off. But that's another question. That's true, Your Honor. I guess one point I want to sort of underscore here, and that may be on Your Honor's minds, is, well, if in fact injunctive and declaratory relief would not include avoiding the guarantee liability, well, what could it include? Well, again, assuming a timely compulsory counterclaim or independent claim had been made, it could include a declaration that the bank's credit underwriting procedures are in violation of the Act. And it can include a mandatory injunction. And, in fact, there are authorities that have done this, cases that have done this, requiring the bank to amend its policies so as to comply with the Act. That's the kind of thing that's necessary to enforce the requirements imposed under the Act. I would also remind the Court that in 2010, Congress extended the statute of limitations for claims under the Act to five years from two years. Now, it's an open question, I think, in this case, whether the five-year or two-year statute would apply, because when the loan was made it was the two years, and then two years later it was extended to the five years. But if you assume that the five-year was in place, which the appellate suggests might be the case, they didn't file a compulsory counterclaim when they should have. Thank you. Thank you, Your Honors. But for the discrimination, they would not have had a guarantee. It would not be proper to allow an enforcement of an ill-gotten guarantee when they obtained that, and that would be under the equitable remedies. Otherwise, it's a toothless statute. That's the problem. Addressing the specifics with regard to Mr. Bryan's affidavit again, paragraph 14, it does say that Mr. Dixon and Bridge Mill were not creditworthy, but it says to refinance the Regions Loan and Mabry Farms Loan. Paragraph 20 that Judge Moore was addressing a minute ago, it says in there, this underwriting requirement referenced in the May 2, 2008 memo, was in place only after Mr. Dixon had chosen to present Mrs. Dixon as opposed to any other guarantor. They had a requirement. That's consistent with paragraph 14 where they required a guarantee. But paragraph 20 hurts you because it says Mr. Dixon had chosen to present Mrs. Dixon. Again, they're addressing not Division 1 or Prohibited Transaction 1. They're trying to address there the paragraph number 5, which basically is to prevent them from doing what they did here. That is, you can't require a guarantee when the loan is otherwise creditworthy by anybody, including the spouse. Now, nobody else can avoid it. You can't avoid the lien if it's the father or the son or a mother. What law prohibits you from requiring a guarantee if you have a creditworthy loan and seeking the guarantee of some other person, not a wife? 202.7d.1. It says the spouse or other person. And that's designed to prevent them asking for this and indirectly getting the spouse. The reason, though, you can't bring an action by a father or somebody else is they're not within the protected category. They're not being discriminated against based upon marital status. Do you have a case or any other legal statutory document that supports your reading of that? We've cited lots of, yes, Your Honor, we've cited lots of other cases because otherwise you would get into this conundrum of litigation over what are the facts. And they could always say, well, we didn't really require them. That's what we do for a living, you know. Yes, Your Honor. We get into these conundrums about what are the facts. And that's why the statute and the regulations limited the way they did. Your red light is on. Thank you. Thank you very much. Thank you both for your argument. The case will be submitted.